1 | DAVID L. NEALE (SBN 141225)
IRV M. GROSS (SBN 53659)
2 | TODD M. ARNOLD (SBN 221868)
LEVENE, NEALE, BENDER, RANKIN & BRILL L.L.P.
3 | 10250 Constellation Boulevard, Suite 1700
Los Angeles, California 90067
4 | Telephone: (310) 229-1234
Facsimile: (310) 229-1244
5 | E-mails: DLN@LNBRB.COM; IMG@LNBRB.COM, TMA@LNBRB.COM
6 |
7 | Counsel for Certain Petitioning Creditors

8 |                    **UNITED STATES BANKRUPTCY COURT**

9 |                    **CENTRAL DISTRICT OF CALIFORNIA**

10 |                         **LOS ANGELES DIVISION**

11 |

12 | In re                                ) Case No. 2:10-bk-19938-BR
                                          )
13 | CAPITOL FILMS DEVELOPMENT, LLC,      ) Chapter 11 Case
                                          )
14 |                    Alleged Debtor.   )
                                          )
15 |                                      ) **NOTICE OF EMERGENCY MOTION**
                                          ) **AND EMERGENCY MOTION FOR**
16 |                                      ) **AN ORDER APPOINTING A**
                                          ) **TRUSTEE; MEMORANDUM OF**
17 |                                      ) **POINTS AND AUTHORITIES IN**
                                          ) **SUPPORT THEREOF**
18 |                                      )
                                          )
19 |                                      ) **[Declarations and Request for Judicial**
                                          ) **Notice in Support of Emergency**
20 |                                      ) **Motion Filed Separately]**
                                          )
21 |                                      )
                                          )
22 |                                      ) <u>Hearing Date:</u>
                                          ) Date:    [TBD]
23 |                                      ) Time:    [TBD]
                                          ) Place:    Courtroom 1668
24 |                                      )                255 E. Temple St.
                                          )                Los Angeles, CA
25 |                                      )
                                          )
26 | _____ )

27 |

28 |

1

# **TABLE OF CONTENTS**

MEMORANDUM OF POINTS AND AUTHORITIES............................. 4

I.      INTRODUCTION................................................................ 4

II.     STATEMENT OF FACTS....................................................... 7

III.    DISCUSSION.................................................................... 8

      A.      The Court Can Appoint an Interim Trustee in an
            Involuntary Chapter 11 Case.............................................. 8

      B.      Standard for the Appointment of an Interim Trustee
            in an Involuntary Chapter 11 Case...................................... 9

      C.      Cause Exists to Appoint an Interim Trustee.......................... 10

      D.      No Bond is Required......................................................18

IV.     CONCLUSION................................................................. 18

i

1

# TABLE OF AUTHORITIES

2

                                                                                                    **Page(s)**

3    **FEDERAL CASES**

4    In re Adelphia Commc'ns Corp.
         336 B.R. 610 (Bankr. S.D.N.Y. 2006) ................................................................ 10
5

     In re Alpine Lumber & Nursery
6        13 B.R. 977 (Bankr. S.D. Cal. 1981) ................................................................. 9

7    In re Clinton Centrifuge, Inc.
         85 B.R. 980 (Bankr. E.D. Penn. 1988) ............................................................. 10
8

9    In re Intercat, Inc.
         247 B.R. 911 (Bankr. S.D. Ga. 2000) ............................................................... 10
10

     In re Marvel Entertainment Group, Inc.
11       140 F.3d 463 (3rd Cir. 1998) ............................................................................. 10

12   In re Oklahoma Refining Co.
         838 F.2d 1133 (10th Cir. 1988) ......................................................................... 10
13

14   In re Professional Accountants Referral Services, Inc.
         142 B.R. 424 (Bankr. D. Colo. 1992) ................................................................ 9
15

     In re Sharon Steel Corp.
16       871 F.2d 1217 (3d Cir.1989) .............................................................................. 10

17

18   **FEDERAL STATUTES**

19   11 U.S.C. 102(3) .................................................................................................... 9

20   11 U.S.C. §§ 105(a) and 1104(a) .......................................................................... 2

21   11 U.S.C. § 303(b) ................................................................................................ 8

22   11 U.S.C. § 303(g) ................................................................................................ 8

23   11 U.S.C. § 1104(a)............................................................................................... 8, 9, 10

24   11 U.S.C. § 1104(a)(1)........................................................................................... 9, 10

25   11 U.S.C. § 1105 .................................................................................................... 9

26

27

28

**TO THE HONORABLE BARRY RUSSELL, UNITED STATES BANKRUPTCY JUDGE:**

**PLEASE TAKE NOTICE** that the following petitioning creditors (collectively, the "Petitioning Creditors") (1) Screen Capital International Corp. ("Screen Capital"), Dox Productions, Limited, Solar Filmworks, L.L.C., Allied Advertising Limited Partnership and 10th & Wolf, LLC, the petitioning creditors in the involuntary Chapter 11 case of Thinkfilm, LLC ("Thinkfilm"), (2) Screen Capital, Allied Irish Bank, plc and Aramid Entertainment Fund Limited, the petitioning creditors in the involuntary Chapter 11 case of R2D2, LLC ("R2D2"), (3) Screen Capital and Jeffery A. Gaul, the petitioning creditors in the involuntary Chapter 11 case of CT-1 Holdings, LLC ("CT-1"), (4) Screen Capital, Studio Transportation Drivers Local, Steven E. Altman and Writers Guild of America West, Inc., the petitioning creditors in the involuntary Chapter 11 case of Capitol Films Development, LLC ("Capitol Films"), and (5) Screen Capital, Teri Zimon, Jonathan K. Beal and David Tuckerman, the petitioning creditors in the involuntary Chapter 11 case of CapCo Group, LLC ("CapCo" and, together with Thinkfilm, R2D2, CT-1 and Capitol Films, the "Alleged Debtors"),[1] hereby move by this motion (the "Motion"), on an emergency basis, for the appointment of a trustee pursuant to 11 U.S.C. §§ 105(a) and 1104(a), Fed.R.Bankr.P. 2007.1 and Local Bankruptcy Rules 2081-1(a)(12) and 9075-1(a).

As set forth more fully below, the Petitioning Creditors submit that there is ample evidence of gross mismanagement, dishonesty and incompetence by the existing management of the Alleged Debtors, and, given this, that the appointment of a trustee during the interim period until the Court adjudicates whether orders for relief should be granted, with such appointment to be made permanent upon the entry of any orders for relief, is imperative in order to protect the interests of creditors.

**PLEASE TAKE FURTHER NOTICE** that the date and time of the hearing on the Motion will be provided once such date and time are set by the Court.

---

[1] The instant motion was filed in each of the five Alleged Debtors' bankruptcy cases.

1   **PLEASE TAKE FURTHER NOTICE** that this Motion is based on this Notice of

2   Motion and Motion, the annexed Memorandum of Points and Authorities, the concurrently

3   filed declarations of Jeffery A. Gaul (the "Gaul Dec."), Hans W. Turner (the "Turner Dec."),

4   Robert Gertz (the "Gertz Dec.") and Henry Lan (the "Lan Dec." and, together with the Gaul

5   Dec., the Turner Dec. and the Gertz Dec., the "Declarations"), the concurrently filed Request

6   for Judicial Notice (the "RJN"), and the exhibits attached to the foregoing in support of the

7   Memorandum of Points and Authorities, any other evidence duly admitted by the Court, the

8   record in this case and the arguments and representations of counsel at the hearing on the

9   Motion.

10   **WHEREFORE,** the Petitioning Creditors respectfully request that the Court enter an

11   order:

12     1.   affirming the adequacy of the notice of the Motion;

13     2.   granting the Motion in its entirety;

14     3.   immediately appointing an interim Chapter 11 trustee pending the entry of an

15          order for relief under Chapter 11, at which time the Chapter 11 trustee shall

16          become the permanent Chapter 11 trustee;

17     4.   directing current management to maintain all books, records, electronically

18          stored information and computer servers, and to not destroy any of the

19          foregoing items, prior to and after any determination on the Motion; and

20     5.   affording such further and other relief as is appropriate under the circumstances.

21   Dated: March 17, 2010                LEVENE, NEALE, BENDER, RANKIN
                                          & BRILL L.L.P.
22
                                          /s/ David L. Neale
23                                        DAVID L. NEALE
                                          IRV M. GROSS
24                                        TODD M. ARNOLD
25                                        Counsel for Certain Petitioning Creditors

26

27

28

**MEMORANDUM OF POINTS AND AUTHORITIES**

**I.**

**INTRODUCTION**

The Alleged Debtors are related entities controlled by David Bergstein ("Bergstein") – five main arteries in a body of approximately 75 corporate entities operating in different countries. Bergstein operates and controls the Alleged Debtors as if they were his own personal fiefdom and bankroll. The revenue of these companies depends almost entirely on the exploitation of a film library estimated to have 700 or more titles, but whose precise ownership is not easily discerned because of the way the company is operated. The last acting Chief Executive Officer estimated the aggregate receivables at approximately $2 to $3 million. This compares to secured debt of at least $100 million. Against this mismatched backdrop of assets and liabilities, there exist no effective corporate controls - virtually no centralized accounting systems and no proper recordation of financial transactions with proper backup and reporting to participants. Bergstein and his assistant move cash – "sweeping" it, in the words of a former Chief Financial Officer – usually without telling anyone why its moved or where it goes. In the meantime, numerous employees are unpaid, payroll taxes remain unpaid across multiple entities and lawsuits have been filed by dozens of creditors, producers and other trading partners for unpaid sums.

Whether there is chaos or calculation behind these current circumstances, only one person is nominally and substantively at the helm of each of the Alleged Debtors and their affiliates and that person is David Bergstein. Because Bergstein has demonstrated repeatedly that he is unfit and incompetent, it is imperative that the Court immediately appoint a trustee during the interim period until the Court adjudicates whether orders for relief should be entered against the Alleged Debtors, which simultaneously had involuntary petitions filed against them by a diverse group of 13 different petitioning creditors. Another affiliated entity is already a debtor in an insolvency proceeding in the United Kingdom.

1    There is no reason to believe that Bergstein can operate the Alleged Debtors in

2  bankruptcy for the benefit of creditors.    The entire business of distributing filmed

3  entertainment – which is the trade of those who own and license rights to film libraries – is

4  predicated on collecting a far larger amount of money than one is generally entitled to keep.

5  There is a whole host of third parties who generally share in proceeds from exploitation –

6  individual actors, directors, producers, as well as collective bargaining entities such as the

7  talent guilds, co-producers and original rights holders and sometimes still others. Under

8  Bergstein's management, the money seems to arrive, but is diverted before it can be used to

9  pay vendors, employees, creditors and the like.  By way of example, according to one former

10  Chief Financial Officer, Thinkfilm was contractually entitled to receive millions of dollars in

11  licensing revenue from another of the Alleged Debtors.  The revenue was received by such

12  Alleged Debtor, but Bergstein never caused the funds to be paid to Thinkfilm and the ultimate

13  disposition of the funds cannot be ascertained.  Even when funds were actually received by

14  Thinkfilm, the funds were almost always transferred to other accounts before Thinkfilm could

15  satisfy creditors' claims.  More than one employee has sworn in a declaration that when he

16  asked Bergstein for information regarding the recipient(s) of such funds and the basis for such

17  transfers, Bergstein would not provide a rational explanation and often would not provide any

18  explanation at all.  As a result of these transfers, certain of the Alleged Debtors often bounced

19  payroll checks and were often unable to pay vendor invoices that had to be paid in order to

20  allow the Alleged Debtors to complete sales and generate revenue.

21    Any notion that Bergstein's misuse of corporate funds might have been temporary,

22  unintentional or otherwise innocently explained crumbles under the weight of the $950,000 in

23  Las Vegas casino "markers" Bergstein obtained by improperly pledging funds from one of the

24  Alleged Debtors' affiliates.  There is also substantial evidence that Bergstein and his business

25  partner have tried to obtain liens against the assets of the Alleged Debtors and their affiliates

26  and foreclose on such liens.  The net result of the foregoing would be to move the assets from

27  the Alleged Debtors and their affiliates to a new entity owned and controlled by Bergstein and

28  others so that only these parties, not the legitimate creditors of the Alleged Debtors and their

1  affiliates, would benefit from the value of the assets.  Certain of the Alleged Debtors also

2  apparently failed to file any federal tax returns and pay withholding taxes for a substantial

3  period of time, despite the fact that funds for the payment of such taxes were withheld from

4  employees' wages.

5      The lack of any formal centralized accounting process at the Alleged Debtors enables

6  Bergstein to move funds at will and simultaneously prevents him from even knowing what to

7  pay third party participants if he had funds to do so.  As mentioned, the Alleged Debtors and

8  their affiliates never had a centralized accounting system.[2]  Instead the financial records of

9  certain of the Alleged Debtors and certain affiliated entities, to the extent they existed at all,

10  were comprised of an Excel spreadsheet subject to Bergstein's exclusive control.  This

11  spreadsheet, however, does not contain full and accurate information and, as a result, the

12  Alleged Debtors are unable to produce accurate, consolidated financial documents, such as

13  income statements, balance sheets and cash flow statements.  The general failure of the

14  collective enterprise to establish a reliable financial reporting system, and the particular failure

15  of the Alleged Debtors to produce fundamental, consolidated financial documents is largely, if

16  not wholly, the result of Bergstein maintaining a veritable black box of financial information

17  that he only doles out on a "need to know" basis, which is almost never.  Because of

18  Bergstein's refusal to create transparency or establish a centralized accounting system, the

19  Alleged Debtors and their affiliates were never able to get an unqualified, global audit

20  completed.  As a consequence, the Alleged Debtors were not able to re-finance their debt and

21  obtain additional financing to maintain and continue operations.

22      What will become clear as additional facts are uncovered and these shadowy

23  transactions and relationships are dragged into the cold light of day is that the Alleged Debtors

24  and their affiliates have been permitted to become rudderless ships, operated (if at all) in

25

26  [2] Although no centralized accounting system exists, Thinkfilm alone maintained an accounting system that
allowed it to prepare financial documents, but this was only because Thinkfilm was able to migrate its data from

27  Canada, where it had an accounting system in place, to the United States when Thinkfilm's Canadian office
closed.  Nevertheless, Thinkfilm is included in virtually all of the references to the "Alleged Debtors" in this

28  Memorandum because, as a practical matter, it too suffered from the inability to create and maintain a reliable
centralized accounting system.

1 chaotic fashion with no clear direction or control. It appears that this chaos has been created

2 purposely to cause confusion regarding the assets owned or controlled by the Alleged Debtors

3 and their affiliates, possibly in order to create a future opportunity to repurchase the assets at

4 "distressed" prices. Bergstein apparently hopes to capitalize on the confusion to use a new

5 third-party entity he has created to attempt to foreclose on the assets of the Alleged Debtors

6 and their affiliates. Simply put, the Alleged Debtors and their affiliates are spinning wildly out

7 of control and there is an immediate risk that assets will be dissipated, records destroyed or

8 lost, and cash diverted, unless a qualified trustee can be appointed immediately.

9       Based on the foregoing, Bergstein cannot be trusted to maintain the status quo during

10 the interim period until the Court determines whether an order for relief should be entered.

11 Similarly, upon entry of an order for relief, Bergstein cannot be expected to uphold his

12 fiduciary obligations and to place the interest of creditors ahead of his own.

13 **II.**

14 **STATEMENT OF FACTS**

15       Bergstein and Ronald N. Tutor ("Tutor") own and/or control a number of affiliated

16 entities (the "Entities"), including, but not limited to, the Alleged Debtors, involved in the

17 business of licensing rights to films and producing and/or financing films.[3] After the closure

18 of the Entities' Toronto office, the Entities included two major operating units located in the

19 United States (the "U.S.") and the United Kingdom (the "U.K.").[4] Bergstein has complete

20 control over all material financial decisions related to the Alleged Debtors and has absolute

21 control over the Alleged Debtors' funds.[5] On March 16, 2010, a diverse group of 13 different

22 petitioning creditors, including secured lenders, former employees, unions, production

23 companies and an advertising vendor, filed involuntary bankruptcy petitions against the five

24 Alleged Debtors.[6]

25

26 [3] Turner Dec., ¶ 2; Gaul Dec., ¶ 3; Lan Dec. ¶¶ 6 and 12.

   [4] Turner Dec., ¶¶ 11; Gaul Dec., ¶¶ 8-10. One of the U.K. Entities, Capitol Films Limited ("Capitol U.K") is

27 already subject to an "administration proceeding" in the U.K., which is akin to a Chapter 11 proceeding. Lan
Dec., ¶¶ 2 and 3.

28 [5] Turner Dec., ¶¶ 2, 3 and 12 and 18; Gaul Dec., ¶¶ 3, 5, 6, 22 and 24; Gertz Dec., ¶¶ 11, 15 and 18.

   [6] See RJN Exhibits "A" through "E."

1    In the interests of brevity, the Court is respectfully referred to the accompanying

2  Declarations for the remaining facts upon which the Motion is based. Those facts, and cites to

3  the Declarations in support thereof, are specifically referred to in the Discussion section below.

4                                   **III.**

5                               **DISCUSSION**

6  **A.    The Court Can Appoint an Interim Trustee in an Involuntary Chapter 11 Case.**

7    Section 303 of the Bankruptcy Code provides, in relevant part, as follows:

8              At any time after the commencement of an involuntary case under
9              chapter 7 of this title but before an order for relief in the case, the
               court, on request of a party in interest, after notice to the debtor and
10             a hearing, and if necessary to preserve the property of the estate or
               to prevent loss to the estate, may order the United States trustee to
11             appoint an interim trustee under section 701 of this title to take
               possession of the property of the estate and to operate any business
12             of the debtor.

13  11 U.S.C. § 303(g).  Although Section 303(g) specifically addresses the appointment of an

14  interim trustee in the context of an involuntary Chapter 7 case, there is no prohibition against

15  the appointment of an interim trustee in an involuntary Chapter 11 case.  To the contrary, such

16  appointment is specifically allowed by the plain language of Sections 303(b) and 1104(a) of

17  the Bankruptcy Code.

18    Section 1104 provides that, at any time after the "commencement" of a Chapter 11 case

19  a party in interest can seek the appointment of a trustee.  11 U.S.C. § 1104(a).  Pursuant to

20  Section 303, an involuntary Chapter 11 case is "commenced" by the filing of an involuntary

21  petition.  11 U.S.C. § 303(b).  Accordingly, read in conjunction, Sections 303(b) and 1104(a)

22  clearly allow the appointment of an interim trustee immediately after the filing of an

23  involuntary petition.  Indeed, if Congress intended to prohibit the appointment of an interim

24  trustee in a Chapter 11 case then Section 1104(a) would have read, "at any time after the entry

25  of an order for relief under Chapter 11 case a party in interest can seek the appointment of a

26  trustee."  Section 105(a) also supports the authority of the Court to appoint an interim trustee

27  where, as here, there is a demonstrated potential for substantial harm to the estate and its

28

1   creditors in the absence of the appointment of an interim trustee.  See In re Professional

2   Accountants Referral Services, Inc., 142 B.R. 424, 429-31 (Bankr. D. Colo. 1992) (holding

3   that "the appointment of a trustee during the gap period – before an order for relief is entered –

4   is authorized and proper under 11 U.S.C. §§ 1104(a)(1), 105 and, by analogy, 303(g)."); see

5   also In re Alpine Lumber & Nursery, 13 B.R. 977 (Bankr. S.D. Cal. 1981) (trustee appointed

6   during gap period in involuntary Chapter 7 case continued in office even after conversion to

7   Chapter 11 even though conversion did not convert involuntary case to voluntary case).

8          A Chapter 11 trustee appointed pursuant to Section 1104(a) remains as the trustee

9   unless and until the debtor shows that it is entitled to regain possession and management of the

10  property of the estate pursuant to a motion under Section 1105.  11 U.S.C. § 1105; see In re

11  Alpine Lumber & Nursery, 13 B.R. at 979.

12  **B.      Standard for the Appointment of an Interim Trustee in an Involuntary Chapter**

13          **11 Case.**

14          The standard for the appointment of an interim trustee in an involuntary Chapter 11

15  case is the standard for the appointment of a trustee under Section 1104(a)(1)[7] in a voluntary

16  Chapter 11 case.  In re Professional Accountants Referral Services, Inc., 142 B.R. at 429.

17          Section 1104(a) states, in pertinent part, as follows:

18                  At any time after the commencement of the case but before
                    confirmation of a plan, on request of a party in interest or the
19                  United States trustee, and after notice and a hearing, the court shall
                    order the appointment of a trustee—
20

21                  (1) for cause, including fraud, dishonesty, incompetence, or
                    gross mismanagement of the affairs of the debtor by current
22                  management, either before or after the commencement of the
                    case, or similar cause . . . .
23

24  11 U.S.C. § 1104(a)(1) (emphasis added).  The list of what constitutes "cause" in Section

25  1104(a)(1) is not exclusive.[8]   Indeed, courts have recognized that "the concepts of

26  incompetence, dishonesty, gross mismanagement and even fraud all cover a wide range of

27  _____

28  [7] Unless the equity holders agree, a trustee generally cannot be appointed under Section 1104(a)(2).   In re
    Professional Accountants Referral Services, Inc., 142 B.R. at 429.
    [8] See 11 U.S.C. 102(3) "'includes' and 'including' are not limiting."

1   conduct." In re Marvel Entertainment Group, Inc., 140 F.3d 463, 472 (3rd Cir. 1998) (citations

2   omitted).    Accordingly, courts often consider the following factors to determine whether

3   "cause" exists for the appointment of a trustee: (1) conflicts of interest, including inappropriate

4   relations between corporate parents and the subsidiaries, (2) misuse of assets and funds of the

5   estate, (3) inadequate recordkeeping and reporting,[9] (4) lack of appropriate cost controls, (5)

6   various instances of conduct found to establish fraud or dishonesty, and (6) lack of credibility

7   and creditor confidence. In re Clinton Centrifuge, Inc.  85 B.R. 980, 985 (Bankr. E.D. Penn.

8   1988).

9       The question of whether to appoint a Chapter 11 trustee must be considered on a case-

10  by-case basis.    In re Sharon Steel Corp., 871 F.2d 1217, 1226 (3d Cir.1989) (whether to

11  appoint a trustee is fact intensive and the determination must be made on a case-by-case basis).

12  The movant has the ultimate burden of showing cause under Section 1104(a)(1) by clear and

13  convincing evidence.  In re Adelphia Commc'ns Corp., 336 B.R. 610, 656 (Bankr. S.D.N.Y.

14  2006).   Although the appointment of a trustee under Section 1104 may be an extraordinary

15  remedy, in the appropriate case, the appointment of a trustee is a power which is critical for the

16  Court to exercise in order to "preserve the integrity of the bankruptcy process and to insure that

17  the interests of creditors are served." In re Intercat, Inc., 247 B.R. 911, 920 (Bankr. S.D. Ga.

18  2000). Accordingly, the standard for the application of Section 1104(a)(1) is quite flexible and

19  gives the Court wide discretion in deciding whether or not to appoint a Chapter 11 trustee. In

20  re Adelphia, 336 B.R. at 656.  In the end, the decision is a factual determination left to the

21  discretion of the Court.   Id.   This discretionary authority is consistent with a "policy of

22  flexibility" permeating the Bankruptcy Code's overall aim of protecting creditors while giving

23  debtors a second chance. In re Marvel, 140 F.3d at 472.

24  **C.      Cause Exists to Appoint an Interim Trustee.**

25      Bergstein's conduct over a protracted period of time demonstrates that cause exists for

26  the appointment of a trustee and that such trustee should be immediately appointed.

27

28  [9] See also In re Oklahoma Refining Co., 838 F.2d 1133, 1136 (10th Cir. 1988) (finding that "other" cause under
    Section 1104(a) includes the failure to keep adequate records).

1           1.    <u>Bergstein Treats the Alleged Debtors' Funds as Fungible and Has Used Such</u>

2                 <u>Funds to Obtain, and Possibly Repay, Personal Loans.</u>

3      Almost every morning, the cash that came into Thinkfilm's bank accounts on the prior

4 day was transferred by Bergstein, with the aid of his assistant, Frymi Biedak ("Biedak"), to

5 various other unknown accounts without any explanation or basis for the transfers.[10] Bergstein

6 also failed to provide relevant financial data to the accounting department so that such

7 intercompany cash transfers, as well as other intercompany transactions, could be properly

8 booked.[11] Most alarmingly, <u>Bergstein used at least one of the Entities' bank accounts as</u>

9 <u>collateral to obtain loans from a casino to fund his personal gambling and may have used funds</u>

10 <u>from one or more of the Entities' to repay such loans.</u>[12] More specifically, Bergstein obtained

11 $950,000 in cash from Mandalay Bay in exchange for "markers" issued to Mandalay Bay.[13]

12 The Bank of America account (Account No. 0671741436) referenced on each of the "markers"

13 is an account that was maintained by Production Management Services, Inc., a subsidiary of

14 CapCo, one of the Alleged Debtors.[14] Bergstein also had complete control over this account.[15]

15           2.    <u>There is a Complete Lack of Accurate Record Keeping and Reporting.</u>

16      As set forth in the Declarations from two former officers (one of whom has known

17 Bergstein for over 20 years) and a former controller of the Alleged Debtors, since at least June

18 2006 to January 2010, and quite likely thereafter, the Entities, including the Alleged Debtors,

19 have not maintained a centralized accounting system and the Alleged Debtors and other U.S.

20 affiliates only sporadically maintained a true accounting department.[16] Efforts to implement a

21 centralized accounting and general ledger system were stymied by a lack of funds and, more

22

23

---

24 [10] Turner Dec., ¶ 10; Gaul Dec., ¶¶ 21, 22 and 26; Gertz Dec., ¶ 18.
[11] Turner Dec., ¶¶ 3, 6, 9 and 10; Gaul Dec., ¶¶ 5, 10, 11, 12 and 22; Gertz Dec., ¶ 18.
25 [12] Turner Dec., ¶ 11; Gaul Dec., ¶¶ 5, 10, 11, 12 and 22; Gertz Dec., ¶ 18. <u>See</u> RJN Exhibit "F" at Exhibit "1"
(the "markers"), Exhibit "4," at ¶ 1 (complaint against Bergstein alleging that he obtained $950,000 in funds
26 pursuant to the "markers"), Exhibit "5," (Bergstein answer to complaint admitting that he obtained $950,000 in
funds pursuant to the "markers").
27 [13] <u>Id.</u>
[14] Turner Dec., ¶ 11.
28 [15] <u>Id.</u>
[16] Turner Dec., ¶¶ 3 and 8; Gaul Dec., ¶¶ 4, 5, 8, 10, 19 and 26; Gertz Dec., ¶ 3.

1   importantly, Bergstein's failure to provide the financial data necessary to implement such

2   systems.[17]

3        The "accounting system" system for the Alleged Debtors (with the exception of

4   Thinkfilm) is basically only an Excel spreadsheet (the "Spreadsheet") maintained by Biedak,

5   Bergstein's assistant, who is not an accountant or officer of the Alleged Debtors, and who

6   simply follows the instructions given by Bergstein.[18]   Certain of the Petitioning Creditors are

7   informed and believe that the Spreadsheet is little more than a check register of the cash and

8   treasury transactions by and among the Alleged Debtors, which are carried out exclusively by

9   Bergstein and Biedak.[19]   The Spreadsheet indicates date, amount paid or received, payee or

10   paying party, the account from which the payment was made or into which the payment was

11   received and sometimes a brief description of the transaction.[20]   The Spreadsheet, however,

12   does not contain any accounting distribution information - i.e., a notation of whether the

13   transaction was an item of revenue, expense, assets, liabilities or owner's equity, and a

14   significant percentage of the transactions either have no description or a description

15   insufficient to allow a proper allocation of the transaction to the appropriate Alleged Debtor.[21]

16   The Spreadsheet also does not include a listing of assets or material items such as bank or

17   investor loan balances and interest payable.[22]   Even more troubling, the Spreadsheet does not

18   include a consolidated listing of the liabilities normally associated with payroll, such as income

19   taxes withheld from employee wages and payable to taxing authorities.[23]

20        The Spreadsheet is so inadequate that certain of the Alleged Debtors have been unable

21   to prepare the most basic accounting documents, such as accurate income statements, balance

22   sheets and cash flow statements since at least June 2006.[24]   When officers and controllers

23   asked Bergstein and Biedak for particular information to confirm entries on the Spreadsheet

24

25 [17] Turner Dec., ¶¶ 3, 6, 7 and 9; Gaul Dec., ¶¶ 4, 11, 12 and 13; Gertz Dec., ¶¶ 3, 4 and 11, 15.
[18] Turner Dec., ¶¶ 3, and 6; Gaul Dec., ¶¶ 4, 5, 6, 10, 11, 12, 14, 15, 16, 18, 19, 20, 22 and 26; Gertz Dec., ¶ 3.
[19] See Turner Dec., ¶¶ 3, and 6; Gaul Dec., ¶¶ 4, 5, 6, 10, 11, 12, 14, 15, 16, 18, 19, 20, 22 and 26; Gertz Dec., ¶
26 3.
[20] Turner Dec., ¶¶ 3, 6 Gaul Dec., ¶ 12.
27 [21] Id.
[22] Id.
28 [23] Id.
[24] Turner Dec., ¶ 3; Gaul Dec., ¶¶ 4, 5, 6, 9 and 11; Gertz Dec., ¶¶ 5 and 9.

1  and to facilitate the preparation of rudimentary accounting documents for certain of the

2  Alleged Debtors, the response was invariably that the information would be forthcoming from

3  Bergstein.[25]  However, Bergstein never provided all of the information necessary, and the

4  information he did provide included numerous questionable allocations and classifications and

5  many unexplained or questionable disbursements.[26]   Accordingly, it is not surprising that no

6  one, except for possibly Bergstein, has a clear understanding of the Alleged Debtors' assets

7  and liabilities.

8         When Hans Turner ("Turner"), the former Chief Financial Officer for certain of the

9  Alleged Debtors, inquired about the foregoing matters, he was cut off from any further

10  involvement in the preparation of financial data and was no longer represented to parties as

11  being the Alleged Debtors' Chief Financial Officer.[27]  Roger Gertz ("Gertz"), the former Chief

12  Operating Officer of CapCo, had a similar experience.  That is, when he asked Bergstein for

13  financial data required to perform his function of collecting receivables, Bergstein indicated

14  that he was working on it but never provided such data to Gertz.[28]  Likewise, Jeffery A. Gaul

15  ("Gaul"), the former controller for certain of the Alleged Debtors, was never able to obtain

16  information that would allow him to prepare consolidated financial statements in accordance

17  with the Generally Accepted Accounting Principals (GAAP), if at all.[29]

18         Compounding the difficulties encountered by the Alleged Debtors' management in

19  obtaining complete financial information from Bergstein was the fact that the Alleged Debtors'

20  management was constantly changing.[30]  For example, in the 22 months that Gaul was with

21  Thinkfilm, there were five different Chief Financial Officers (one of whom lasted less than a

22  week).[31]

23         As a result of the foregoing, the Alleged Debtors' experienced officers and controller

24  were never able to get a firm grasp on the Alleged Debtors' actual financial position or prepare

25

---

26  [25] Gaul Dec., ¶¶ 14, 18, 19, 21 and 22; Gertz Dec., ¶¶ 4 and 13.
[26] Turner Dec., ¶¶ 3, 6, 7, 9 and 10; Gaul Dec., ¶¶ 4, 5, 10, 11, 12, 14, 18, 19, 20, 22 and 26.

27  [27] Turner Dec., ¶ 7.
[28] Gertz Dec., ¶ 4.

28  [29] Gaul Dec., ¶¶ 7 and 18.
[30] Gaul Dec., ¶ 3.
[31] Id.

1  reliable financial documents for the Entities' U.S. unit.[32]   Accordingly, it was (and still is)

2  highly unlikely, if not impossible, for the Alleged Debtors to obtain unqualified consolidated

3  audits from a nationally recognized accounting firm.[33]  As a result of the Alleged Debtors'

4  inability to prepare reliable financial documents, the Alleged Debtors were unable to re-

5  finance their debt and obtain additional capital to fund operations.[34]

6       3.   Thinkfilm Has Failed to Pay Amounts Owed to Producers and to Obtain Funds

7            Paid to Other Entities From the Distribution of Titles Owned by Thinkfilm and

8            Payable to the Producers and Other Creditors.

9       The preparation of Thinkfilm's "producer statements" provides a specific example of

10 Thinkfilm's failure to maintain accurate records.  A producer statement is a contractually

11 required accounting of a film's financial performance that is provided to the producer of a film

12 under a distribution or licensing agreement.[35]  In or around March 2008, when Turner took

13 over responsibility for preparing Thinkfilm's Producer Statements, he found that Thinkfilm

14 was almost six months behind in preparing its Producer Statements.[36]  As a result of, among

15 other things, the lack of a centralized accounting system, it took until the fourth quarter of

16 2008 for Turner to catch up on the preparation of Thinkfilm's producer statements.[37]

17      When Turner did identify a producer that was owed money by Thinkfilm, he would

18 request a check for payment.[38]  Almost invariably, no check would be issued based on an

19 alleged lack of funds.[39]  Turner did not find the claimed lack of funds credible, because he

20 could see that one of the affiliates of Thinkfilm received millions of dollars from the

21 distribution of titles owned by Thinkfilm, yet these funds were not paid to Thinkfilm for the

22 benefit of the producers or Thinkfilm's creditors.[40]  Turner communicated the non-payment

23 issue to another executive of Thinkfilm but did not receive a satisfactory response as to if or

24

25 [32] Turner Dec., ¶ 3; Gaul Dec., ¶¶ 4, 5 and 6; Gertz Dec., ¶ 5.
   [33] Turner Dec., ¶¶ 5 and 8; Gaul Dec., ¶ 18.
26 [34] Gaul Dec., ¶ 7; Gertz Dec., ¶ 9.
   [35] Turner Dec., ¶ 12.
27 [36] Turner Dec., ¶ 16.
   [37] Id.
28 [38] Turner Dec., ¶ 18.
   [39] Id.
   [40] Turner Dec., ¶¶ 19 and 21.

1  when payment would be made.[41]  Turner followed up by emailing the foregoing executive and

2  copying Bergstein with such emails.  After months of inquiries and learning that almost all

3  other vendors of Thinkfilm were also not being paid, Turner stopped issuing check requests to

4  pay producers.[42]  As of September 2009, the date of the last producer statements prepared by

5  Turner, Thinkfilm owed over 40 producers in excess of $3 million through September 31,

6  2009, and virtually no payments at all were made that entire year.[43]  Thinkfilm also has a large

7  number of other unpaid accounts payable that have resulted in numerous actions being asserted

8  against it and over 20 judgments and/or arbitration awards being entered against it.[44]

9      4.   The Alleged Debtors Have Failed to Manage Costs.

10      At a time when the Alleged Debtors had approximately $150 million in debt, only

11  approximately $2 to $3 million in collectable receivables (despite Bergstein's belief that there

12  were $10 to $15 million in such receivables), and a revenue stream insufficient to cover

13  operating expenses, the Alleged Debtors continued to incur approximately $400,000 per month

14  in salaries and related expenses.[45]  Based on the foregoing, it is not surprising that payroll

15  checks issued by the Alleged Debtors were often returned for lack of sufficient funds.[46]

16      5.   Certain of the Alleged Debtors Have Failed to File Federal and State Tax

17         Returns.

18      As of January 2010, certain of the Alleged Debtors had not filed any federal or state

19  tax returns, other than state tax returns filed by certain Alleged Debtors in states that allowed

20  production tax rebates or credits.[47]

21      6.   Certain of the Alleged Debtors Have Failed to Pay Federal Payroll Taxes.

22      As of January 2010, certain of the Alleged Debtors had not paid to the IRS federal

23  payroll taxes withheld from employee paychecks since July 2009.[48]

24

[41] Turner Dec., ¶¶ 18 and 19.
25  [42] Turner Dec., ¶ 19.
[43] Turner Dec., ¶ 17.
26  [44] Gertz Dec. ¶ 14.  Also, attached to the RJN as Exhibits "G" through "K," respectively, are dockets for actions
initiated against Thinkfilm (36 actions), R2D2 (12 actions), CT-1 (1 action), CapCo (14 actions) and Capitol
27  Films (8 actions), in state and federal courts in New York, California and Delaware over the past 5 years.
[45] Gertz Dec. ¶¶ 6-8.
28  [46] Gaul Dec., ¶¶ 5 and 23; Gertz Dec., ¶ 5.
[47] Gaul Dec., ¶ 24.

1     7.    The Mismanagement of the Alleged Debtors is Prohibiting the Alleged Debtors

2          from Realizing Income on Their Assets.

3     The Alleged Debtors have proven to be woefully inept at managing and exploiting

4 their intellectual property.    The documentation for Alleged Debtors' film library is so

5 disorganized that it is unclear what rights the Alleged Debtors' own with regard to each film,

6 which makes it extremely difficult to negotiate sales.[49]    Once a sale is negotiated, the Alleged

7 Debtors are often unable to consummate the sale because the various elements necessary to

8 replicate films are stored at different film laboratories throughout the U.S. and the U.K. that

9 are owed money by the Alleged Debtors and that will not deliver copies without payment.[50]

10 Despite the fact that the payments to be made to such laboratories often dwarfed the revenue

11 that would be generated by making such payments, Bergstein refused to make the payments.[51]

12 In fact, Bergstein sometimes promised to make the payments necessary to close a deal, but

13 then failed to make the required payments.[52]

14     8.    There are Conflicts of Interest and Inappropriate Relations Among the Entities,

15          Including the Alleged Debtors.

16     One of the U.K. Entities, Capitol U.K., is currently subject to an administration

17 proceeding in the U.K. (the "U.K. Proceeding"), which is the equivalent of a Chapter 11

18 case.[53]  An administrator of the U.K. Proceeding (the "U.K. Administrator"), is informed that

19 TFC Library, LLC ("TFC"), an entity owned directly or indirectly by Tutor, one of the owners

20 of the Alleged Debtors, has scheduled a foreclosure sale in Los Angeles regarding certain

21

22 assets owned by Capitol U.K. and other of the Alleged Debtors.[54]    It is possible that either

23

---

24 [48] Gaul Dec., ¶¶ 5 and 24.
[49] Gertz Dec., ¶ 10.

25 [50] Gaul Dec., ¶ 6; Gertz Dec., ¶¶ 10 - 12.
[51] Gertz Dec., ¶¶ 11 - 12.

26 [52] Gertz Dec., ¶¶ 11 - 12.
[53] Lan Dec., ¶¶ 2-3.

27 [54] Lan Dec., ¶ 6.  Attached as Exhibit "A" to the Lan Dec. is a copy of the Amended and Restated Notice of
Disposition of Collateral (the "Sale Notice") pursuant to which TFC is attempting to foreclose on the assets of,
among others, Capitol U.K. and the Alleged Debtors.  As can be seen from Schedules "1" and "2" to the Sale

28 Notice, there is no delineation of what Entities own what assets.  The Entities and assets are simply clumped
together.  Thus, arguably all of the listed Entities own all of the assets.  This is further evidence of inadequate

TFC has no security interest in such assets, or obtained alleged security interest directly or indirectly from Bergstein/Tutor by way of an intermediate assignment/sale of rights from Pangea Media Holdings Limited and/or Pangea Media Limited (together "Pangea"), which are companies incorporated in the U.K. owned or controlled by Bergstein/Tutor.[55]    That foreclosure sale also affects assets owned by the Alleged Debtors.[56] Thus, in effect, an entity in which Tutor/Bergstein have an interest is seeking to foreclose on assets owned by other entities in which Tutor/Bergstein have an interest.  As further evidence of collusion, Veritam and Film Investments Limited, both of which are controlled by Bergstein/Tutor have made offers to purchase Capitol U.K.'s assets.[57]    Thus, Bergstein/Tutor are trying through various of their entities to foreclose on Capitol U.K.'s assets pursuant to security interests obtained from transactions among the Bergstein/Tutor entities or to purchase such assets.    The foregoing set of transactions are collectively referred to as the "Insider Transactions."  The U.K. Administrator is in the process of investigating Insider Transactions between Pangea and Capitol U.K.[58]

9.    The Alleged Debtors' Lack Credibility and Creditor Confidence.

As discussed above, in addition to the U.K. Proceeding that is going forward, 13 different creditors have now filed involuntary petitions against the five Alleged Debtors.[59] The filing of these involuntary bankruptcy petitions, as well as the facts discussed above, establish that the Alleged Debtors and Bergstein, who owns and/or controls the Alleged Debtors, lack credibility and that there is little, if any, creditor confidence in current management.

---

record keeping by the Alleged Debtors, and a potential basis for substantive consolidation.  More importantly, any act to carryout the sale referenced in the Sale Notice would be a blatant violation of U.K. insolvency law. See Lan Dec., ¶¶ 3, 4 and 10.
[55] Lan Dec., ¶¶ 6, 8, 11 and 12.
[56] See footnote, 54, supra.
[57] Lan Dec., ¶¶ 14 and 15.
[58] Lan Dec., ¶ 12.
[59] RJN Exhibits "A" through "E."

1 **D.     No Bond is Required.**

2      Since the Petitioning Creditors are requesting the appointment of a trustee under

3 Section 1104, not Section 303(g), Fed.R.Bankr.P. 2007.1, not Fed.R.Bankr.P. 2001, is

4 applicable to the appointment of such trustee and no bond other than that which may be

5 customarily required from a Chapter 11 trustee is required.

6                                    **IV.**

7                             **CONCLUSION**

8      Bergstein has demonstrated incompetence and gross mismanagement of the Alleged

9 Debtors for years.  Nor can he be trusted in the circumstances given his track record and

10 conflicting set of interests.  He never created real accounting systems that are step one for

11 anyone genuinely interested in settling their debts or produced accurate financial documents as

12 one is obligated to provide to secured lenders and the government.  It appears altogether likely

13 that Bergstein retained tight control over financial information because he was aware of the

14 impropriety of the withdrawal of funds from Thinkfilm's bank account and the transfers of

15 funds he made to other Entities.   The lack of financial information thwarted the Alleged

16 Debtors' efforts to re-finance their debt and obtain additional funding and has prohibited them

17 from filing tax returns.  Bergstein's improper daily sweeps of Thinkfilm's funds, causing CT-1

18 to retain millions of dollars of sublicense fees that should have been remitted to Thinkfilm, and

19 his refusal to permit the payment of nominal amounts owing to film laboratories that would

20 have allowed Thinkfilm to collect substantial amounts from distributors, all caused Thinkfilm

21 to suffer financially.

22      Faced with mounting debt and a sinking ship, Bergstein and Tutor have initiated a

23 scheme to obtain the Alleged Debtors' assets for their sole benefit and to the detriment of the

24 Alleged Debtors' bona fide creditors.   These efforts, as well as Bergstein's inexplicable

25 transfers of funds among the Entities, create harsh conflicts of interests among Bergstein,

26 Tutor, and the Entities themselves.

27      In consideration of the foregoing, it not surprising that Bergstein has little credibility

28 with creditors and a broad spectrum of creditors – from the teamsters to the guilds to numerous

1    producers - have lost confidence in Bergstein's ability to competently manage Thinkfilm, as is

2    evidenced by the five involuntary petitions signed by 13 different petitioning creditors.

3        In summary, based on the facts discussed herein, Bergstein cannot be trusted to

4    continue managing the Alleged Debtors during the interim period until the Court determines

5    whether an order for relief should be entered.  Likewise, Bergstein cannot be expected to meet

6    his fiduciary obligations to creditors once an order for relief is entered.   Accordingly, the

7    Petitioning Creditors respectfully request that the Court enter an order:

8        1.   affirming the adequacy of the notice of the Motion;

9        2.   granting the Motion in its entirety;

10       3.   immediately appointing an interim Chapter 11 trustee pending the entry of an

11         order for relief under Chapter 11, at which time the Chapter 11 trustee shall

12         become the permanent Chapter 11 trustee;

13       4.   directing current management to maintain all books, records, electronically

14         stored information and computer servers, and to not destroy any of the

15         foregoing items, prior to and after any determination on the Motion; and

16       5.   affording such further and other relief as is appropriate under the circumstances.

17   Dated: March 17, 2010                    LEVENE, NEALE, BENDER, RANKIN
                                              & BRILL L.L.P.

18

19                                            /s/ David L. Neale
                                              DAVID L. NEALE

20                                            IRV M. GROSS
                                              TODD M. ARNOLD

21                                            Counsel for Certain Petitioning Creditors

22

23

24

25

26

27

28