DAVID L. NEALE (SBN 141225)
IRV M. GROSS (SBN 53659)
TODD M. ARNOLD (SBN 221868)
LEVENE, NEALE, BENDER, RANKIN & BRILL L.L.P.
10250 Constellation Boulevard, Suite 1700
Los Angeles, California 90067
Telephone: (310) 229-1234
Facsimile: (310) 229-1244
E-mails: DLN@LNBRB.COM; IMG@LNBRB.COM, TMA@LNBRB.COM

Counsel for Certain Petitioning Creditors

# UNITED STATES BANKRUPTCY COURT

## CENTRAL DISTRICT OF CALIFORNIA

## LOS ANGELES DIVISION

| | |
|---|---|
| In re | Case No. 2:10-bk-19938-BR |
| CAPITOL FILMS DEVELOPMENT, LLC, | Chapter 11 Case |
| Alleged Debtor. | **DECLARATION OF HANS W. TURNER IN SUPPORT OF EMERGENCY MOTION FOR AN ORDER APPOINTING A TRUSTEE** |
| | Hearing Date: |
| | Date:   [TBD] |
| | Time:   [TBD] |
| | Place:  Courtroom 1668 |
| | 255 E. Temple St. |
| | Los Angeles, CA |

# DECLARATION OF HANS W. TURNER

I, Hans W. Turner, declare as follows:

1. **30 Years in the Accounting Profession.** I have been a Certified Public Accountant for over 30 years, working mostly in the motion picture and television production and distribution industry. I hold undergraduate and graduate degrees in Economics and Finance from UCLA. My first job after UCLA was in the Los Angeles office of Price Waterhouse & Co. (prior to it becoming PriceWaterhouseCoopers). I have held various positions as Controller, and later as Chief Financial Officer ("CFO"), of The Samuel Goldwyn Company, CFO of Franchise Pictures LLC, and CFO of Mobius International Inc. ("Mobius"), one of a number of companies controlled by David Bergstein ("Bergstein"). The current status of my license in California is inactive.

2. **Responsibilities Within the Bergstein Companies.** In May, 2004 Bergstein asked me to join Mobius as its Chief Financial Officer. Subsequently, at Bergstein's direction, I transitioned from Mobius to a group of new entities, including CT1 Holdings, LLC, Capco Group, LLC and others (collectively, the "Company"), all of which were controlled by Bergstein. During the time I worked for Bergstein, many new companies were created, all of which were subsidiaries of or related to the complex groups of holding companies like CT1 Holdings and Capco Group, all of which were tightly controlled by Bergstein personally. I departed from the Company in January, 2010. During the approximately five and one-half years I worked for the various Bergstein entities, I held various financial and operational positions. Bergstein decided what duties and responsibilities employees had but rarely assigned formal titles. As a practical matter my time was spent principally on accounting, motion picture production and financing matters, collections, assisting the Business Affairs Department, financial analysis, film library

acquisitions, generating "Producer Statements," and working with the Company's attorney on the numerous lawsuits filed against it.

## LACK OF INFORMATION MADE ACCURATE, CREDIBLE ACCOUNTING IMPOSSIBLE

3. **Replacing the Accounting Department with a Single Spreadsheet.** In approximately the third quarter of 2006, Bergstein made the decision to terminate the sole remaining accountant from what had been the Mobius accounting department and thereby eliminated the accounting department in Los Angeles. Bergstein determined that it was sufficient for the Company to simply rely on his assistant, Frymi Biedak ("Biedak"), to perform certain basic bookkeeping functions. She and Bergstein were already handling all matters relating to cash receipts and disbursements. With the elimination of the accounting department, the only regular accounting that was performed was Biedak's maintenance of a single Excel spreadsheet (the "Spreadsheet"). The Spreadsheet was essentially a check register. The information recorded on the Spreadsheet wasn't remotely sufficient to permit the proper classification of items into categories of revenue, expense, assets, liabilities or owner's equity. It was therefore impossible to prepare even the most basic accounting documents, such as <u>accurate</u> income statements, balance sheets and statements of cash flow from such Spreadsheet. Without the necessary descriptive financial information and without having adequate supporting documentation underlying the data on the Spreadsheet, one could not verify whether a particular transaction had a bona fide business purpose or was in fact for the purpose it was being represented to be on the Spreadsheet. This situation never changed for the CT1 group of companies from approximately September 2006, when the Company's accounting department was eliminated, through January 2010. While there was talk of reconstituting the accounting department for the Company in late 2007 (and subsequently), initially by hiring a company Controller, at the time we were transitioning the Thinkfilm, LLC ("Thinkfilm") accounting department from Toronto to Los Angeles, no action was ever taken in this regard and the Spreadsheet remained the only accounting "system" the Company had through the time I left the Company.

4. **Lack of Accounting an Impediment to Financing.** The inability to create basic financial statements was especially problematic for the Company's efforts to raise sorely needed capital, or to refinance the Company's crushing debt. In January, 2008, after Bergstein had appointed me CFO, a meeting was held with, among others, D.B. Zwirn ("Zwirn"), the Company's principal lender, for the purpose of "kicking off" an effort to refinance the Company's debt. Zwirn advised that in order to attract a lender for the significant amounts that the Company was seeking to refinance, the Company would need audited financial statements, and asked that the Company engage a nationally recognized accounting firm to perform a consolidated audit. A consolidated audit would have comprised an audit of the three major operating units, the British company, Capitol Films Ltd., the Canadian headquartered Thinkfilm, LLC and the US based Capitol Group and all of their related subsidiaries.

5. **Bergstein Shuns Recognized National or International Accounting Firm.** After the meeting, Bergstein advised me that he did not want to engage a national firm (as Zwirn had strongly suggested), and he and I continued to disagree over that for some time. It was my contention that we could never receive a consolidated audit opinion if we engaged three separate, small regional or local firms, and that an audit of such a far-flung enterprise whose assets and liabilities and revenue and expense were intrinsically intermingled would require the international scope of a larger firm. Nevertheless, and irrespective of who would perform the audit, the US operations required a set of stand-alone financial statements in order that they could be audited and be consolidated with the other two operating units.

6. **Bergstein Reworks the Spreadsheet.** In the January, 2008 meeting with Zwirn, Bergstein stated that he was working on the "accounts" (i.e. the Spreadsheet) in terms of giving descriptions, making allocations and account classifications and would "soon" pass on to me the revised Spreadsheet. Bergstein was going to add sufficient description and to classify each transaction in a way that would have supposedly enabled basic financial statements to have been created from such Spreadsheet. We did not receive the revised Spreadsheet until April of 2008.

- 4 -

When I initially reviewed the revised Spreadsheet, however, I found numerous questionable allocations and classifications, numerous receipts and disbursements with no explanation, a number of items which on their face did not appear to have a proper Company business purpose and a complete lack of documentation to backup many hundreds of entries. I went to Mike Corrigan, who at that time was the Chief Operating Officer, and who was also a former Price Waterhouse partner and would, I believed, understand my concerns about being able to draw off a set of financial statements from the Spreadsheet as it had been presented to us. I told Mr. Corrigan that, in my opinion, knowing that the financial statements would be presented to third party financial institutions for purposes of obtaining financing, I would be committing professional gross negligence (and for all I knew, possibly even bank fraud) if I were to accept at face value and *carte blanche* the Spreadsheet as Bergstein had revised it and use it, unmodified, as a basis for financial statement preparation. I explained to Mr. Corrigan that I would be happy to attempt to prepare the accounts, but I would have to reclassify, reallocate or do what I thought was proper to as many transactions as I believed to be necessary in order to fairly present the financial position and results of operations of the Company. Mr. Corrigan was in complete agreement with my viewpoint.

7.   **Removal from Financial Statement and Refinancing Project.** When I made the comments to Mr. Corrigan about my view of the state of the Spreadsheet as had been handed to us, a third person was in the room at Mr. Corrigan's invitation, Melanie Alshab, an Information Technology consultant Bergstein had hired to improve the Company's computer system. It is my belief that Ms. Alshab reported my remarks to Bergstein because the next day after my comments to Mr. Corrigan, I was cut off from any further involvement in the preparation of financial data, I was denied access to subsequent revisions of the Spreadsheet, and I was no longer represented to parties inside or outside the Company as the CFO.

8.   **No Financial Statements, No Audit.** To this date. consolidated financial statements have never been prepared for the US operations, the audits that had commenced in

- 5 -

London and Toronto for those respective entities were never completed and no auditor for the US was selected and of course, no audit was ever commenced.

9. **Without Accounting Systems, Collected Moneys Could Not Be Tracked.** CT1 Holdings sublicensed the motion pictures in the Thinkfilm library to Image Entertainment ("Image") for distribution by Image in the home video, television and digital download markets. This sublicense generated millions of dollars in revenue to CT1 from Thinkfilm product. I knew this because I received first monthly, and then later quarterly, royalty statements from Image. The vast majority – virtually all – of the monies received from Image never flowed back to Thinkfilm to meet Thinkfilm's obligations. When I would check the Thinkfilm bank account, one of the few whose information I had access to, I could see that the money from Image never came into the account and, therefore, was never used for Thinkfilm business. Without an accounting system for CT1, other than the inadequate Spreadsheet, the disposition of the millions of dollars received from Image was indeterminate to anyone in the accounting department.

10. **Bergstein and Biedak Continue to Sweep Cash on a Daily Basis.** What I did know was happening daily was that at least every morning, and often more than once a day, Bergstein and/or Biedak would sweep the Company's bank accounts and move cash. The Company had three basic operating entities: Capitol UK, Capitol US and Thinkfilm, LLC. Many basic operating expenses of these entities were not getting paid despite incoming revenue, so that although we were never told where the money was going, it was apparent that it was not going to the entities that generated the revenue. This situation, like all the others I have described in this declaration, was on-going and still occurring at the time I left the Company in January 2010.

11. **Bergstein's Gambling Losses.** Production Management Services, Inc. ("PMS") is a subsidiary of Capco Group, one of the alleged debtors in this involuntary bankruptcy case. During the time I was working in the Company, PMS maintained a bank account at Bank of America, Account No. 0671741436 (the "PMS Account"). As with all of the entities under his

control, Bergstein had sole and complete control over PMS. As part of his complete control over PMS, Bergstein had exclusive access to the PMS Account. I have reviewed the Motion for Summary Judgment attached as Exhibit "F" to the Request for Judicial Notice filed concurrently with the present motion for appointment of a trustee. Attached as exhibits to the Motion for Summary Judgment, Exhibit "F", are copies of "markers" to Mandalay Bay Corp., totaling $950,000, in the name of "David R. Bergstein". All of the "markers" reflect that they are drawn on the PMS Account.

## THE PRODUCER STATEMENTS WENT UNPAID: FUNDING THE COMPANY WITH OTHER PEOPLE'S MONEY

12. **I Assume Responsibility for "Producer Statements" – Financial Reporting to Third Party Participants.** A discussion was held in early 2008 as to who in Los Angeles would take over the responsibility of preparing Producer Statements upon the transition of the Thinkfilm accounting activities from Toronto. Mr. Corrigan asked me to take over the responsibility of preparing such periodic reports, and I agreed to do so. A "Producer Statement" is a contractually required accounting of a film's financial performance issued to the producer of a film (or to the actual owner of distribution rights in and to the film) under a distribution or license agreement. The Producer Statement reflects the amounts received from the exploitation of a film, the expenses incurred in connection therewith, the recoupment of any advances paid to the producer or grantor of rights by the distributor of the film, the assessment of interest and any other factor called for in the distribution agreement, as well as the amount due to the producer if the film was "in profits" or the unrecouped amount if it was not.

13. **Entertainment Companies Act as Temporary "Custodians" of Other People's Money.** Producer Statements (and of course, the underlying distribution agreements from which they arise which specify the duties, rights and obligations of the parties to each other) reflect the fact that many distribution companies in the entertainment industry, like the Company here, are

essentially custodians of other people's money: these companies collect revenue, deduct their distribution fee and expenses, and then remit the balance, if any, to the client or other third party due the money. Because of the legal "duty to account" and because it is extremely important for distributors ("acquirers of film product") to maintain good relations with producers ("sellers of film product") accurate accounting and reporting is critical. In addition to producers or other grantors of distribution rights, the various entertainment industry guilds, such as the Writers Guild, the Directors Guild, Screen Actors Guild, and their pension and health plans, require periodic (generally quarterly) reporting for the purposes of payment of residuals. While producers share in the profits of a film, as such profits are defined in the distribution agreements, the Guilds have entered into industry-wide labor agreements with producers and distributors that call for the payment of residuals. Residuals are generally assessed as a percentage of gross receipts on a given film, irrespective of the profitability, or lack thereof, of a motion picture. The practical effect of failing to report and remit either or both the producer's profit participations and Guild residuals is that the non-remitting company has unfettered use of the funds, and the party due the money has unwittingly and involuntarily becomes the company's de facto financier.

14.    **Company Willfully Failed to Make Residual Payments.** I was in charge of the residual calculations for the Company. Accordingly, I know for a fact that with only a few rare exceptions, the Company consistently failed to make its residual payments to the Guilds. Mr. Bergstein was aware of the numerous demands made by the various Guilds but never responded to my e-mails about when or if we would report or pay pursuant to such demands. The Guilds do not make a demand unless they have assured themselves that gross receipts had been collected, and accordingly, a percentage thereof was owed to their members. Irrespective of the fact that there were numerous demands by the Guilds, the Company also did not report or make payment on the many films for which reporting and payment were due but for which the Guilds had not made a formal demand.

15. **I Generated the Producer Statements and Took the Angry Calls from Unpaid Producers.** In addition to being involved in creating the systems and procedures to generate Producer Statements, I personally prepared the quarterly Producer Statements. I also dealt with the many producers and/or their representatives who contacted the Company in writing or by telephone about their statements, the contact being mostly about not getting paid the amounts that were shown as being owed to them on their Producer Statements.

16. **Producers Begin to Sue the Company.** Thinkfilm had a library of approximately 200 films and because it was a distributor and not a producer, had acquired all of them from various grantors of rights. This of course necessitated periodic producer reporting on every Thinkfilm title. At the point when I took over those responsibilities, Thinkfilm was over six months late in sending out Producer Statements. Part of this was owing to the decision to close the Toronto office (as of December 31, 2007) and transfer all its activities, including accounting, to the Company's office in Los Angeles and the time necessary to accomplish this complex transition. Los Angeles had no accounting department or accounting system at the time the decision to close Toronto was made and we had to both implement a system and hire and train an accounting staff. During this chaotic time, I was repeatedly contacted by producers wanting to know when I would be able to send out their statements. Additionally, I was in constant communication with the Company's legal department, which was dealing with lawsuits by various producers for, among other things, failing to provide Producer Statements, failing to pay the amounts due as set forth in the Producer Statements that had been previously sent out by Toronto, and failing to pay some or all of the licensing fees (advances or minimum guarantees) Thinkfilm had agreed to pay under licensing agreements despite the fact it had received the film elements and/or was exploiting the film.

17. **$3 Million Owed to Participants and Virtually Nothing Paid.** The last Producer Statements I prepared were for the quarter ending September 30, 2009. As of

September 30, 2009, Thinkfilm owed over 40 different producers collectively in excess of $3 million. However, I know that virtually nothing was paid to participants in 2009.

18. **Payment Requests Denied, Checks to Participants Never Cut.** When I first began preparing Producer Statements, if a statement showed a balance due a producer, I would prepare a check request and submit it to the accounting department for processing with the anticipation a check would be returned to me promptly for mailing with the Statement as required by the distribution agreements. In fact, with only a very few exceptions, checks were never issued, purportedly for lack of funds. Initially, I went to the CFO at that time, Evan Warshawsky, and told him about this problem, but I never received a satisfactory response from him regarding if and when payment would be sent out. From past experience I knew better than to discuss this with Bergstein directly, but I did copy him on e-mails to Mr. Warshawsky and others regarding this nonpayment situation, so there is no question but that Bergstein knew what was going on in the profit participation accounting area.

19. **I Finally Give Up Submitting Check/Payment Requests Altogether.** Finally, after a few months of not getting a satisfactory response to my inquiries, and knowing that almost all other Thinkfilm vendors also were not being paid, I stopped issuing check requests. This cessation was also the suggestion of the accounting department, which did not want to keep processing paperwork for no discernable purpose.

20. **The Situation Seemed To Only Get Worse.** The foregoing situation never improved by the time I left the Company in January, 2010, and given the overall

condition of the Company that I have described in this Declaration, I have every reason to believe that the problem of not paying the producers for their profit participations continued after I departed the Company.

21. **The Inability to Pay Could Not Have Been Caused By Lack of Funds – Money Was Coming In.** Being told there was no money and that no payments could be made was particularly puzzling and disconcerting--and, frankly, not credible--because I could see from the Thinkfilm accounting records which I used in the statement preparation process, that the Company had received and collected significant amounts of monies on various films. For example, as I explained above, I received periodic statements from Image, Thinkfilm's home video and television sub-distributor, showing millions of dollars paid to CT1 Holdings, LLC for distribution related to Thinkfilm titles. Nevertheless, I never saw any of the money go into the Thinkfilm account for the benefit of its creditors.

I declare under penalty of perjury and the laws of the United States of America that the foregoing facts are true and correct, are known to me of my own personal knowledge, and I could and would competently so testify if called upon to do so.

Executed this 15th day of March 2010 at Los Angeles, California

**SEE ATTACHED**

Hans W. Turner

condition of the Company that I have described in this Declaration, I have every reason to believe that the problem of not paying the producers for their profit participations continued after I departed the Company.

21. **The Inability to Pay Could Not Have Been Caused By Lack of Funds – Money Was Coming In.** Being told there was no money and that no payments could be made was particularly puzzling and disconcerting--and, frankly, not credible--because I could see from the Thinkfilm accounting records which I used in the statement preparation process, that the Company had received and collected significant amounts of monies on various films. For example, as I explained above, I received periodic statements from Image, Thinkfilm's home video and television sub-distributor, showing millions of dollars paid to CT1 Holdings, LLC for distribution related to Thinkfilm titles. Nevertheless, I never saw any of the money go into the Thinkfilm account for the benefit of its creditors.

I declare under penalty of perjury and the laws of the United States of America that the foregoing facts are true and correct, are known to me of my own personal knowledge, and I could and would competently so testify if called upon to do so.

Executed this 15th day of March 2010 at Los Angeles, California

_____
Hans W. Turner

11