DAVID L. NEALE (SBN 141225)
IRV M. GROSS (SBN 53659)
TODD M. ARNOLD (SBN 221868)
LEVENE, NEALE, BENDER, RANKIN & BRILL L.L.P.
10250 Constellation Boulevard, Suite 1700
Los Angeles, California 90067
Telephone: (310) 229-1234
Facsimile: (310) 229-1244
E-mails: DLN@LNBRB.COM; IMG@LNBRB.COM, TMA@LNBRB.COM

Counsel for Certain Petitioning Creditors

**UNITED STATES BANKRUPTCY COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

**LOS ANGELES DIVISION**

| | |
|---|---|
| In re<br><br>CAPITOL FILMS DEVELOPMENT, LLC,<br><br>　　　　　　　Alleged Debtor. | Case No. 2:10-bk-19938-BR<br><br>Chapter 11 Case<br><br>**DECLARATION OF ROGER GERTZ IN SUPPORT OF EMERGENCY MOTION FOR AN ORDER APPOINTING A TRUSTEE**<br><br><u>Hearing Date:</u><br>Date:　[TBD]<br>Time:　[TBD]<br>Place:　Courtroom 1668<br>　　　　255 E. Temple St.<br>　　　　Los Angeles, CA |

## DECLARATION OF ROGER GERTZ

I, Roger Gertz, declare as follows:

1. **I have known David Bergstein ("Bergstein") for over twenty years.** In or around September, 2009, at Bergstein's request, I became the acting Chief Operating Officer of Capco Group, LLC. My background and experience is set forth in my resume, a true and correct copy of which is marked as Exhibit "1" and is attached hereto and incorporated herein by reference.

2. **Hired Initially to Collect Money and Evaluate Personnel.** At the time I was hired, Bergstein told me that my mandate was to clear up and collect the receivables due to Capco Group, LLC (together with is affiliated entities, the "Company"), which he erroneously represented to me were in excess of $10 Million. In addition, I was to evaluate personnel, clear up issues relating to the Company's ability to deliver films to its licensees and, eventually, to run the Company.

3. **No Accounting Systems, No Basic, Reliable Financial Data.** When I began my employment, I interviewed everyone at the Company in a senior position, approximately ten people in all. Bergstein told me that he had instructed all senior employees (i.e. those who were not support staff) to provide me with whatever documentation I requested relating to the operations and systems of the Company. Accordingly, in connection with my interview of the accounting department, which was comprised at the time of Chief Financial Officer Evan Warshawsky, Controller Jeff Gaul, Controller of Thinkfilm, LLC, Jeff Dea, Hans Turner, who was in charge of preparing quarterly producer statements, and several accounts receivable and payable persons, I asked to see financial data relating to the Company. In response, one or the other of Messrs. Warshawsky, Turner and Gaul (all of whom are certified public accountants) provided me with some Excel spreadsheets and reports, and informed me that the Company did

2

not have a central, systemized financial reporting structure, and that Bergstein "takes care of" of the financial transactions of the Company.

4. **Bergstein Hoards Critical Financial Information.** I was stunned by the fact that no one in the accounting department could provide me with anything resembling a balance sheet, general ledger or other financial documentation customarily maintained in a corporate accounting department. Nevertheless, I followed the direction of Messrs. Warshawsky, Turner and Gaul, and approached Bergstein and asked him to provide me with financial data for the Company. Bergstein's response was that he was "working on it" and that he would get "it" to me once he was finished. In fact, however, I never received any financial documents from Bergstein, nor to my knowledge was the accounting department provided with such documentation at any time prior to my departure from the Company in January 2010.

5. **In Interviews, No Employee Can Reliably Estimate Company's Revenues but Everyone is Aware Company is Highly Leveraged.** During the course of the interviews I conducted, I asked each person what he or she understood the revenues and liabilities of the Company to be. No two people I interviewed had the same understanding of the Company's assets and liabilities, but it was clear to me from the totality of the responses I received that the Company was highly leveraged with no prospective revenue stream sufficient to meet its operating overhead.

6. **$150mm in Liabilities at a Minimum.** From what I could deduce, the Company's liabilities appeared to be in the $150 million range. Although no one in the accounting department had records of significant portions of this debt, I was able to calculate this number based upon information from various employee regarding monies received by the Company over time from individual investors and loans from financiers, as well as money owed to vendors, producers, employees and taxing authorities. I also knew from my review of documentation and from the interviews I conducted that D.B. Zwirn and Aramid Entertainment

1  Fund were owed no less than $100 Million in principal alone. I reported my findings to
2  Bergstein, who did not dispute my calculations. Rather, Bergstein merely responded that the debt
3  "would be taken care of," without further explanation.

5      7.    **Bergstein Sees $15mm in Receivables Where I Count $3mm At Best.** I also
6  considered the Company's accounts receivable, which Bergstein had represented to me were in
7  the neighborhood of $10-$15 million. Bergstein insisted that the receivables were fully
8  collectible if only someone would just get on top of them and push collections. However, upon
9  my review of these receivables based upon information provided to me by both Bergstein and the
10 accounting department, I found that most of the receivables Bergstein believed were good were,
11 in fact, not so: many of them were aged beyond collection and should have been written off,
12 others had been previously collected and not booked, and still others had been put into
13 "suspension" accounts pending allocation on the books. Realistically, I concluded, good
14 receivables were in the range of $2-3 Million. I sent Bergstein a memorandum regarding the
15 collection of revenues, a true and correct copy of which is marked as Exhibit "2" and is attached
16 hereto and incorporated herein by reference.

18     8.    **Overhead Running at $400,000 per Month.** I also considered the Company's
19 monthly salaries and expenses. These salaries and expenses were in excess of $400,000 per
20 month, excluding rent and other overheard. Given the state of the Company's receivables, as I
21 explained above, I could not see where there was sufficient incoming revenue to support these
22 expenses.

24     9.    **Bergstein Remains Tight Lipped About Supposed Refinancing Efforts.** In
25 light of the foregoing, I told Bergstein that I believed the Company could not continue to carry
26 such massive debt, and I asked him how he intended to deal with this problem; in fact, I asked
27 Bergstein this on more than one occasion. In each instance, the only response I received from
28 Bergstein--without reference to any specifics--was that he was trying to refinance the Company's

debt. My response was that, in my opinion based on the data I had seen, the Company neither had the receivables nor the revenue stream from its film library to cover its expenses or to support a refinancing. I should also note that when Bergstein told me he was negotiating with certain unnamed financial institutions to refinance the Company's debt, I asked Messrs. Warshawsky and Gaul what financial statements they had prepared to facilitate such refinancing. Their response was that they had not, and could not, prepare anything because they had insufficient access, and with respect to certain information no access at all, to the Company's financial data and financial transactions except for those few that Bergstein told them about.

10. **Review of Sales Department & Inventory Reveal Critical Problems.** I also interviewed the individuals in the Company's sales department, delivery department and legal department. From these conversations, I concluded that: (i) the film library's documentation was so disorganized that it was very difficult to negotiate sales of any of the library's film rights because it was unclear what rights the Company owned with regard to each film and (ii) film copies could not be delivered as contractually required because the film elements necessary to replicate the films were stored at film laboratories throughout the United States and United Kingdom that were owed money and would not release copies until they were paid.

11. **Refusal to Pay Even Small Amounts Further Hampers Operations, "Traps" Assets.** It appeared to me that the Company's assets were "trapped": there were ways in which the Company could generate additional cash, but Bergstein's total control over the disposition of the Company's funds, and his use of those funds for purposes he essentially would not reveal to anyone, made it almost impossible to do the things necessary to bring more money into the Company. One of the easiest ways it appeared to me to raise cash was to pay the film laboratories who held the Company's film elements, and by doing so getting the laboratories to allow the films to be delivered to the distributors. Once they had the films, the distributors would remit fees to the Company. The amount of those fees usually exceeded significantly the amount necessary to satisfy the labs; nevertheless, Bergstein simply would not pursue this route. For

example, on one occasion, I told Bergstein that a payment to a film laboratory of a nominal amount (under $20,000) would allow the film to be delivered to distributors who were then obligated to pay the Company significant distribution fees. Bergstein responded that he would pay the film laboratory, but I later learned that he never did.

12. **Typical Bait and Switch.** On another occasion, I was able to get Nordisk, a Scandinavian distributor, to agree to remit its money to the Company if I promised to pay the film laboratory, Fotokem, so that the film Nordisk had contracted for could be delivered to it. I explained the situation to Bergstein, and he authorized me to tell Nordisk that Fotokem would be paid. Nordisk remitted the money, which was deposited into an account controlled (as all accounts were) by Bergstein. But Bergstein failed to honor what we discussed, the film laboratorywas never paid and of course, Nordisk never took delivery of the film.

13. **Bergstein, Rarely Present in the Offices, Presides Over Functionally Insolvent Company.** By sometime in November, 2009, I had concluded my interviews and other inquiries. It was apparent the Company was not solvent, and to make matters worse, it had no effective management in place that could guide a turnaround. Evan Warshawsky, the Chief Financial Officer at the time I started with the Company, had left and had not been replaced. The persons who still remained in ostensible management positions tried to manage but were unable to do so because they lacked resources and had no authority to make decisions regarding any material matters without Bergstein's input and approval. As if that was not enough of an impediment, the ability to function was made even more difficult because Bergstein was rarely present at the Company's offices, so that his input could not be solicited in any event. As a result, employees came to me frequently asking for direction. However, I was in the same bind because I had such limited authority to act independent of Bergstein, and quite often I could not even get in touch with him to discuss a matter. Moreover, when I was able to speak to Bergstein, typically he would go off on some tangent and avoid answering my questions.

14. **Besieged by Creditors.** When Mr. Warshawsky left the Company in October 2009, I became the de facto point person for creditors to call and demand payment. I was aware of numerous lawsuits that were pending against the Company, in addition to over 20 judgments and/or arbitration awards previously rendered against it. In my conversations with creditors I had no choice but to tell them that the Company had no money and that they would have to continue to wait for their payments. Some of the creditors had debts that went back <u>years</u>.

15. **Total Control Exercised by Bergstein.** At all times during the course of my employment, Bergstein made all financial decisions relating to the Company, including its myriad subsidiaries and affiliates. Bergstein had sole control over the funds of the Company, and to my knowledge did not regularly report the Company's financial transactions to any other person in the Company, be it myself or anyone in the accounting department. The only bank account to which any of the accounting personnel were permitted access was that of Thinkfilm, LLC.

16. **Bergstein's Plans to Initiate a UK Bankruptcy.** In early January, 2010 Bergstein told me he was going to London and was planning to put the Company's United Kingdom operation into "administration." In that regard, Bergstein said he was going to move to storage facilities and was going to "assign assets" to another one of the entities he controlled. I understand Bergstein did go to London in mid-January, 2010.

17. **Unpaid, I Finally Left.** I left the Company in January 2010 due to non-payment of my salary. On at least one occasion, my paycheck was dishonored and returned by the bank for insufficient funds, an experience shared by many vendors and other employees. Indeed, at the time I left, the Company was several weeks behind in making payroll to its remaining employees.

18. **A Business in Total Crisis.** The daily mode of operation at the Company while I was there was that of a business in total crisis. When money came into the Company, it was diverted by Bergstein for use as he saw fit, with no discussion with anyone else in the

1  Company (other than his assistant Frymi, who would assist him in "sweeping" the various
2  accounts daily for cash). Every day was consumed with doing whatever it took to keep the doors
3  open, without any regard for the interests of the Company's creditors, or for that matter it
4  appeared to me, its employees.

6  I declare under penalty of perjury and the laws of the United States of America that the
7  foregoing facts are true and correct, are known to me of my own personal knowledge, and I
8  could and would competently so testify if called upon to do so.

10  Executed this 17 day of March 2010 at Los Angeles, California

_____
Roger Gertz

# EXHIBIT "1"

# *RESUME*

*ROGER GERTZ*
*23731 Stagg Street*
*West Hills, CA  91304*
*(818) 712-0800 x200*

---

| | |
|---|---|
| Acting C.O.O. | Capitol Films<br>9/15/09 – 11/15/09 Resigned |
| C.O.O. | DocPrep Services, Inc.<br>Calpacific Mortgage, Inc.<br>West Hills, CA<br>1995 – Present |
| President | Primerit Mortgage, wholly owned<br>Subsidiary of Primerit Bank<br>Las Vegas, NV |
| Executive V.P. | First Home Mortgage, wholly owned<br>Subsidiary of Sooner Federal Savings and Loan<br>Tulsa, OK |
| C.O.O. | GameFan Magazine<br>Calabasas, CA |
| Senior V.P./Board of Directors | Countrywide Funding<br>1969 – 1975 |

Miscellaneous troubleshooter for various companies regarding operations

Supervisor for various companies with multi branches employing hundreds of personnel

Positions held required my overseeing of Administration, Accounting, Sales, and the day-to-day operations of all companies.

# EXHIBIT "2"

## MEMORANDUM

To: David
From: Rodger
Date: October 5, 2009

David-

After two weeks of sitting and talking to your people, I find glaring problems that I am sure you are aware of. The most important item is your collection of revenues.

| | |
|---|---|
| **Receivables** | |
| Capitol (Humphrey) | $12,635,763 |
| US (Think) | $ 3,283,743 |
| | |
| **Total:** | **$15,919,506** |
| | |
| **Not Invoiced** | $ 7,400,000 |
| | |
| **Balance Billed** | $ 8,519,506 |
| | |
| **Problem Funds**-Collection Acct Funds, Non-Collectible (may be written off), Bankruptcy, Legal Problems, etc. | $ 7,863,506 |
| | |
| **Net Receivables-Collectible** | $    653,000 |

An addition $1.7 million is being held in escrow on the Think Film purchase. We must pay fourth Canadian attorney roughly $20k-$30k to proceed with the case in order to retrieve these dollars. We have a court status hearing on October 12th and depositions in late October where we need Canadian counsel present. Without Canadian counsel on board we are limited in our ability to put on our case and ultimately obtain the escrowed funds.

There are numerous changes that should be made in your collections department where one person is accountable for worldwide receivables and not fractionalized as it is today.

There are numerous other changes that should be made which I will discuss with you. The main problem is that no one will make a decision without you. Therefore, nothing gets done. You must decide whether you are going to be a Chief Executive Officer or an Operations Officer, as you have been, which is a total disaster.

*[handwritten notes: Image - Computer / Lionsgate]*