DAVID L. NEALE (SBN 141225)
IRV M. GROSS (SBN 53659)
TODD M. ARNOLD (SBN 221868)
LEVENE, NEALE, BENDER, RANKIN & BRILL L.L.P.
10250 Constellation Boulevard, Suite 1700
Los Angeles, California 90067
Telephone: (310) 229-1234
Facsimile: (310) 229-1244
E-mails: DLN@LNBRB.COM; IMG@LNBRB.COM, TMA@LNBRB.COM

Counsel for Certain Petitioning Creditors

**UNITED STATES BANKRUPTCY COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

**LOS ANGELES DIVISION**

| | |
|---|---|
| In re | ) Case No. 2:10-bk-19938-BR |
| CAPITOL FILMS DEVELOPMENT, LLC, | ) Chapter 11 Case |
| Alleged Debtor. | ) **DECLARATION OF JEFFERY A. GAUL IN SUPPORT OF EMERGENCY MOTION FOR AN ORDER APPOINTING A TRUSTEE** |
| | ) Hearing Date: |
| | ) Date: [TBD] |
| | ) Time: [TBD] |
| | ) Place: Courtroom 1668 |
| | )        255 E. Temple St. |
| | )        Los Angeles, CA |

# DECLARATION OF JEFFERY A. GAUL

I, Jeffery A. Gaul, declare as follows:

1. I am a California licensed Certified Public Accountant, with over twenty years of experience in finance. I have worked in both public and private companies in finance positions, including Chief Financial Officer, Controller and Vice President of Finance. My background and experience is detailed in my resume which is marked as Exhibit "1" and is attached hereto and incorporated herein by reference.

2. On or about March 24, 2008, I was hired as a consultant to Thinkfilm, LLC ("Thinkfilm"), and then CT1 Holdings, LLC, and to entities affiliated with these companies (collectively, the "Company"). After twenty-two chaotic months, I left the Company in January, 2010.

## AN OVERVIEW: A COMPANY OUT OF CONTROL

3. The entire time I was with the Company, it was managed by David Bergstein ("Bergstein"), who exercised monolithic control over the affairs of the Company. As I explain in more detail below, Bergstein micro-managed virtually all aspects of daily operations, and this was particularly true in my area of involvement, the financial affairs of the Company. While the Company ostensibly had financial managers, such as controllers, chief financial officers ("CFOs") and chief operating officers ("COOs"), the reality was that in the 22 months I was at the Company there was a "revolving door" of such individuals, none of whom were able to exercise authority independent of the constraints placed upon them by Bergstein, and none of whom lasted long enough in their position to establish any meaningful center of control or responsibility apart from Bergstein. These individuals were: CFOs Hans Turner, Michael Corrigan, Richard Suhl, Evan Warshawsky and Michael Olsen ( the latter of whom lasted less

2

than a week) as well as COOs William Shpall and Roger Gertz, and controllers Edward Melocoton and myself. The last CFO was Evan Warshawsky, who left the Company in October 2009. At the time I left the Company in January 2010, the last acting COO, Roger Gertz, also left. To the best of my knowledge, neither the CFO nor the COO position has been filled.

4.    When I joined the Company in March 2008, it had no functioning accounting and/or financial reporting system. As a result, there was no way to reliably discern the Company's financial condition; when I left the Company twenty-two months later, no such systems had been put in place and the resulting disorganization was just as bad, if not worse. Today, only a few months later, I have no reason to believe the situation is any different. The principal method of financial control is exercised by Bergstein's assistant, Frymi Biedak ("Frymi"), who keeps a form of check register with some basic information about deposits and disbursements from dozens of checking accounts (the "Spreadsheet"). Every once in a while I got to see the Spreadsheet, but few people other than Frymi and Bergstein had real access to it. Certainly the Spreadsheet did not contain sufficient information from which to prepare accurate financial statements; because it was so closely guarded (and easily manipulated), I doubted how much of its scant information was, in fact, accurate.

5.    As a result of the "information hoarding" by Bergstein, the accounting department was completely in the dark with respect to significant amounts of material financial information, and each day began in a similar state of crisis: not only were we unable to generate accurate and reliable financial reporting documents, we also couldn't carry out basic cash management tasks. We had no idea, for instance, whether money might be coming in that day and, if so, whether it might stay put long enough for us to pay vendors. In a normal, functioning accounting department, accounts receivable and payable have a discernible process based on shared information that should result in a reasonably predictable flow of working capital. In the 22 months I was with the Company, two of the four people in the "accounting department" spent up to two-thirds of their day "chasing the money", usually without much success. The lack of cash --

or perhaps better put, the inability to marshal the Company's cash due to Bergstein appropriating and re-directing all incoming cash in his sole discretion - resulted in vendors not getting paid, checks being returned for insufficient funds ("NSF"), employees' paychecks bouncing and payroll taxes being calculated (by third parties) and deducted from salary checks but never, in fact, paid over to the government. I believe in the entire time I worked at the Company that no meaningful amount of payroll tax was paid by any of the myriad companies controlled by Bergstein (at least not when compared to the amount of the gross liability).

6. Bergstein's efforts to wall of the Company's cash and informational resources hampered more than just the day to day activities of the accounting department. When, for example, it became obvious that the Company needed to refinance its bank debt in order to survive, no transaction could be consummated because we were still unable to generate up-to-date financial statements under generally accepted accounting principles ("GAAP"). Furthermore, because Bergstein and Frymi swept the cash that came into the Company each morning, we had no way to pay outstanding bills. Unable to pay critical vendors, the Company was forced to seek "fresh" ones. One such group of critical vendors are the film laboratories where film elements are stored. Unless paid, the film laboratory will not release the film for delivery to the distributor, who in turn will withhold payment from the licensor (i.e. the Company) so long as delivery is not effected. Bergstein, however, deliberately refused to make the money available to pay the film laboratories. Without the ability to effectuate "physical delivery" of the film elements, controlling the license to film properties, the Company's core business and asset group, is meaningless.

7. All of the foregoing conditions existed when I joined the Company and they all existed when I left 22 months later, with a worsening outlook. As a result of the persistent and alarming inability to gather reliable information and to implement reasonable cash management practices, the Company missed opportunities to re-finance its mounting debt and to retain key employees (who at one point, like myself, were enthusiastic and dedicated staffers). At the same

4

time, problems with creditors escalated and the Company's ability to realize value from its assets seized up. The Company was veering out of control when I joined; by the time I left, it was in utter chaos.

### LACK OF INFORMATION CREATES OPERATIONAL DIFFICULTIES

8. At the time I joined the Company, there was no general accounting system in place whatsoever – practically unheard of for a company claiming to have over $100 million worth of assets. Initially, my engagement was to be part of the effort to change this by implementing and installing newly purchased, sophisticated accounting software that would integrate the accounting of Thinkfilm with those of the other operating entities of the Company. The reason for this was that the Thinkfilm office in Toronto was to be closed and core functions of that entity assumed in Los Angeles. Had we been allowed and otherwise able to succeed, completing the task would have meant also creating the policies and procedures for maintaining a general ledger system. To my knowledge, such a system would have been a first for the Company.

9. My task was quickly complicated by a number of events. Shortly after I arrived, Mr. Melocoton, the Controller, left the Company. Bergstein asked me to assume the position of Controller and to assist the London, Toronto and Los Angeles offices in preparing and readying the 2007 financial statements for audit. This was in addition to implementing the use of the new software-based general accounting system as part of the absorption of the Thinkfilm financial reporting duties by the LA office.

10. In order to help with the audit, one of the first things I needed was access to information regarding all of the financial transactions of the Company. I discovered almost immediately, however, that this information was unavailable for any of the entities comprising the Company other than Thinkfilm, and Capitol Film Limited – that meant that critical information was missing for a great many entities. Although the Company had over fifty (50) various

subsidiaries and affiliates, it did most of its business through just a handful of companies. Nonetheless, preparing true consolidated financials meant having information on all the entities. Other than the new accounting software system (which was specifically acquired in order to close the Toronto office of Thinkfilm and control its cashflow from Los Angeles) and the system in London, there was no general accounting system in place at the Company. As I have mentioned, the new one purchased for the Thinkfilm integration was not yet operational. Thinkfilm's Toronto office had sent its hardcopy accounting files to Los Angeles and I was in regular contact with the London accounting personnel, but with respect to any other transaction material to the accounts, I had no access to pertinent information.

11. Throughout all of 2008 and 2009, I never received any financial documents that would allow the accounting department to properly account for the financial transactions of the various entities in the United States. The closest I got to any pertinent financial information was the occasional look at the Spreadsheet.

12. On the first occasion I was shown the Spreadsheet, I considered it no more useful than a basic check register, listing amount paid or received, date of payment, payee or paying party, the account in which the receipt was received or payment made from, and a brief description. Because no one else had real access to it on a regular basis, there was no way to know whether the information was accurate or not. The Spreadsheet did not contain any accounting allocation information, i.e. no notation of whether a transaction pertained to assets or liabilities of the Company, whether it was properly considered an item of income or expense, and a significant percentage of the transactions either had no description at all, or a description so terse that no accounting allocation or classification could be reliably made. The Spreadsheet did not include the capitalized film assets of the Company, by far its largest and most important asset group, or material items such as bank or investor loan balances and interest payable. Nor did the Spreadsheet record the many intercompany transactions and numerous cash transfers between the

various entities comprising the Company. It did not even include a reconciliation of monthly bank statements across accounts.

13. Particularly troubling to me from the day I arrived until I left, the Spreadsheet did not record any of the normal liabilities associated with payroll, such as income taxes payable to governmental authorities for taxes withheld from employees' paychecks. No record of payroll taxes or other payroll related obligations was ever presented to me or anyone else in the accounting department for review for computational correctness or for recording, but (strangely) nearly all the payroll checks that were cut were calculated net of payroll taxes.

14. I repeatedly asked for a comprehensive accounting allocation but was consistently told by either Bergstein, his assistant Frymi, or Melanie Alshab (another consultant to the Company who worked closely with Bergstein) that Bergstein was "working on it," and it would be forthcoming "soon"; <u>I never received any such information.</u>

15. Without the necessary information, the accounting department had no opening balance for 2007, and, therefore, was unable to close the Company's 2007 books. Without the closing balance, the books for 2008 could not be opened.

16. I should note that although the Company invested in licensing a sophisticated accounting software system known as "Great Plains," it did not have the funds to train the accounting staff nor did it have the funds to download all of the necessary data from the Toronto system in order to have a comprehensive historical set of books on the new system. I dealt with a consultant from RMS McGladrey who sold the system to the Company and was supposed to install, train and configure the system for the accounting department, but because of lack of funds, the training and necessary accounting modules to make the system were abandoned. As a result, all department personnel were required to learn the system as we went along, which was

inefficient and ineffective, and the fact of the matter is that the Great Plains system never functioned as intended.

17. This pattern repeated itself during my tenure. In or around July, 2008, the Company needed to produce acceptable financial statements for its principal lender, a hedge fund known as D.B. Zwirn Special Opportunities Fund, LLC ("Zwirn"). (In or around November, 2009, Zwirn filed suit in the Los Angeles Superior Court against Bergstein and another individual in connection with their guarantees of approximately $120 Million of the Company's debt; the action is currently pending.).

18. Bergstein instructed me to produce financial statements for Zwirn, and I responded that I could if provided appropriate information. Bergstein, however, never provided me with the necessary information. Without the information, there were so many unanswered questions that it was impossible to create financial statements in accordance with GAAP, and I was certainly unwilling to put my name on a financial statement like that. Consequently, to the best of my knowledge, the Company was unable to furnish Zwirn or any third party with the requisite financial statements. Based on my experience, I can state unequivocally that at the time I left, the best result the Company could obtain if an audit was undertaken would be a "qualified" or "going concern" opinion, and the qualifications would be so severe as to be devastating for the Company.

19. The foregoing problems were also aggravated by the fact that there was no data sharing or integrated accounting across departments. While different departments had "pieces" of information, Bergstein made sure that no single individual or department had the entire picture. Such sharing and integration of information could not occur without Bergstein's impetus and involvement, and he made no effort to improve the situation. Thus, legal had no idea if a licensee was current on its payments and the delivery (or "servicing") department had no idea whether they could get materials to a licensee on time (triggering much needed final payments). So long as Bergstein continued to parse out information on a "need to know" basis only, it was impossible

to create an effective and comprehensive accounting system (such as a general ledger system) and the Company and its assets suffered as a whole.

20. Bergstein's refusal to allow any reasonable flow of financial information impacted the sales department as well – the unit primarily responsible for generating revenue from the Company's assets. For the sales department to function properly, it must reliably know and be able to access what films are available for license and in what territories – the list of territorial rights "availabilities" as they are called. The inability to generate, locate or collect payments from customers, however, meant that the Company could not afford to implement an effective rights management system. With no such system in place, the sales department had no way of knowing its true "inventory" and therefore no way to make genuine sales.

## THE INFORMATION PROBLEM BECOMES A CASH PROBLEM

21. The handling of cash was another area of "irregularity" within the Company. At Bergstein's direction, multiple accounts were opened--I would estimate in excess of twenty-- most of which neither I nor anyone else in the accounting department had access to, even for tracking purposes. Frequently, customers would remit cash to the Company's bank accounts to liquidate their payable obligations, yet I would not learn about that until after the fact when I contacted the customer to collect the receivable. Only then did I discover the money had already been remitted. I would then ask Frymi about the payment received from the customer, but her usual response was simply "the money's gone."

22. Early each morning, cash was "swept" from the Thinkfilm account by Bergstein or Frymi without the "accounting department" being informed of the nature of the transaction. As a result, we had been trained to record a cash receipt and then an intercompany receivable from the Bergstein entity to which it had been transferred, assuming we were advised of the entity (there were too many entities to keep track; if we were not told which one specifically, the default

entry was CT1 Holdings). Beyond that we had no information with which to provide a description for the transaction. I frequently asked the CFO (whoever it was at the time or sometimes I would ask Frymi directly), for the information on these transactions for purposes of recording them in the accounting system. I was always told my request would be passed on to Bergstein; in every instance, however, the request was ignored and the information was never forthcoming, so the entries all remained deficient. Incredibly, Frymi would tell me not to be concerned because she was reconciling the bank statements "to the penny", as if reconciling a bank statement was somehow a substitute for proper accounting and business practices.

23.    Checks frequently were dishonored by the bank and returned to the Company stamped "NSF". I knew this because in addition to the fact that the accounting department would get frequent calls about NSF checks from vendors and others who had received them, my own payroll checks bounced as did those of many other employees in the Los Angeles office. These occurrences became so frequent in 2008-2009 that my bank, which I had been with for 18 years, closed my account.

24.    During my entire 22 month tenure with the Company, Bergstein was the only one who determined if funds were available, which bills to pay (or not) and when checks would get written (and mailed). The conscious avoidance of paying taxes was a particularly glaring and egregious offense. Specifically, payroll taxes were either paid late or, at least from mid-July, 2009 until I left, they were not paid at all. Nor were tax returns filed with the IRS. The one exception I can recall is that Bergstein made sure a state return was filed for the special purpose entity in those states (such as New Mexico) where the Company would receive a production tax rebate or credit.

25.    Beginning in 2008, Thinkfilm and other related entities were sued numerous times for nonpayment of outstanding debts. These lawsuits were for all manner of the Company's obligations: trade payables for goods or services provided, profit participation payables, unpaid

advances or minimum guarantees for distribution rights, investors seeking return of invested sums, and even threatened litigation from former Thinkfilm employees who were not paid their severance payments after they left the Company. I know this because I was asked by the Company's counsel, Susan Tregub, to assist in litigation support by preparing schedules, producing invoices, receipts and other documentation and information to assist Company counsel in defense of such suits. While I understood that in some instances there were grounds to dispute the alleged debt, in my research of the facts I generally found that the amounts alleged by the plaintiff were in fact legitimate obligations of the Company, and had been due and owing to the plaintiff for some time.

26. I never had a clear understanding of how the banking was handled (as one might otherwise expect someone working in my capacity to have), because Bergstein would not permit anyone else (other than Frymi, acting at his direction) to be involved in banking functions. While it is not uncommon for such "treasury" functions to be handled separately from accounting functions (though typically the treasury function is only separately broken out in large corporations or midsize companies with large daily cash movements), it is uncommon ( in fact, I would say unique, in my work experience), for the accounting department not to at least be given the information necessary for the proper recording of treasury transactions. Without such information, recordation of assets, liabilities, income and expense is impossible.

I declare under penalty of perjury and the laws of the United States of America that the foregoing facts are true and correct, are know to me of my own personal knowledge, and I could and would competently so testify if called upon to do so.

Executed this 17th day of March 2010 at Los Angeles, California

**SEE ATTACHED**

_____
Jeffrey A Gaul

advances or minimum guarantees for distribution rights, investors seeking return of invested sums, and even threatened litigation from former Thinkfilm employees who were not paid their severance payments after they left the Company. I know this because I was asked by the Company's counsel, Susan Tregub, to assist in litigation support by preparing schedules, producing invoices, receipts and other documentation and information to assist Company counsel in defense of such suits. While I understood that in some instances there were grounds to dispute the alleged debt, in my research of the facts I generally found that the amounts alleged by the plaintiff were in fact legitimate obligations of the Company, and had been due and owing to the plaintiff for some time.

26. I never had a clear understanding of how the banking was handled (as one might otherwise expect someone working in my capacity to have), because Bergstein would not permit anyone else (other than Frymi, acting at his direction) to be involved in banking functions. While it is not uncommon for such "treasury" functions to be handled separately from accounting functions (though typically the treasury function is only separately broken out in large corporations or midsize companies with large daily cash movements), it is uncommon (in fact, I would say unique, in my work experience), for the accounting department not to at least be given the information necessary for the proper recording of treasury transactions. Without such information, recordation of assets, liabilities, income and expense is impossible.

I declare under penalty of perjury and the laws of the United States of America that the foregoing facts are true and correct, are know to me of my own personal knowledge, and I could and would competently so testify if called upon to do so.

Executed this 17th day of March 2010 at Los Angeles, California

_____
Jeffrey A Gaul

# EXHIBIT "1"

**Jeffery A. Gaul, CPA**
5930 Sitting Bull Place
Simi Valley, CA. 93063
(805) 813-2326                    e-mail: jeff.gaul@yahoo.com

**Relevant Experience**

- Twenty years experience in CFO, Controller and VP of Finance positions.
- Solid understanding of Generally Accepted Accounting Principles and Financial Accounting Standards
- Public & private company experience
- Experience in software & technology environment including internet & e-commerce.
- Experience w/ capital acquisition and venture backed organizations
- International operations experience
- Member of the American Institute of CPAs and California Society of CPAs

**Employment Experience**

Mar 2008 – Jan 2010   **CT-1 Corporation, Century City, California**
CT-1 is at the hub of an $80 million international entertainment group with interests in production, post-production, library management, foreign sales and distribution.
Position: Consultant
Responsibilities: My engagement was to provide support to the Chief Financial Officer and serve as Controller for the parent company during their search for a permanent Controller. Subsequent to the hiring of the new Controller I worked directly on the implementation and testing of a new Great Plains accounting software package and reorganization of the global business structure.

Mar 2007 – Dec 2007   **Decurion Corporation**, Beverly Hills, California
Decurion Corporation is a $400 million portfolio company consisting primarily of three business divisions, Pacific & Archlight theaters (the theater division), Robertson Property Group (the real estate development & management division) and the Other Operations division.
Position: *Consultant.* (under contract with *Peopleflex Accounting Professionals*)
Responsibilities: My engagement was to provide support to the Chief Accounting Officer and act as a backfill for the Controller for the parent company during the implementation and testing of a new J.D. Edwards accounting software package and complete business transformation.

2002 - 2007   **Triniti Corporation**, Del Mar, California
Triniti Corporation is a multinational developer of Enterprise Resource Planning (ERP) and Manufacturing Execution Systems (MES) software solutions.
Position: *Chief Financial Officer.*
Responsibilities: Provide leadership and coordination of company accounting, administration and other department functions. Develop and implement accounting strategy for U.S., India & Japan. Monitor and analyze accounting and administrative activity against goals. Create, coordinate, and evaluate the financial programs and supporting information systems of the company to include budgeting, tax planning & conservation of assets real estate. Ensure compliance with local, state, federal & foreign reporting requirements. Preparation of financial statements, financial reports, special analyses, and information reports. Establish and maintain appropriate internal control safeguards. Interact with other managers to provide consultative support to planning initiatives through financial and management information analysis, reports, and recommendations. Develop and direct the implementation of strategic business and/or operational plans, projects, programs, and systems.

| | |
|---|---|
| 1999 - 2002 | **Jeffery A. Gaul, Business & Financial Services**, Simi Valley, California<br>Sole proprietorship that provided business and financial services primarily to small or start-up businesses anticipating a public offering or securities registration.<br>Position: *Sole Proprietor*<br>Services: Provided organization and preparation of company and financial information required for SEC registration statements, securities filings and due diligence documentation. Also consulted and participated in the implementation of financial and management systems. |
| 1998 - 1999 | **Digital Entertainment Network**, Santa Monica, California<br>Digital Entertainment Network was the evolutionary archetype for the distribution of existing audio/video content on demand and the production of original, online, interactive, TV/film-style programming primarily for distribution on the worldwide web.<br>Position: *VP Finance & Administration.*<br>Responsibilities: Supported implementation and start-up of a global Internet entertainment network. Prepared management reports, annual budgets and sales forecasts. Presented financial matters to Board of Directors. Participated in preparation of business plan and strategic planning. Negotiated with banks, and financial institutions to procure capital investment, lines of credit, short and long term borrowing. Supervised finance and accounting department. |
| 1995 – 1998 | **Digital Planet**, Culver City, California<br>Digital Planet was a pioneer in Website development and a provider of e-commerce and Internet solutions. Clients included the United States Postal Service, Mattel, MCA Universal and Allstate Insurance.<br>Position: *CFO & VP of Administration*<br>Responsibilities: Prepared management reports, annual budgets and sales forecasts. Presented financial matters to Board of Directors. Participated in preparation of business plan. Negotiated with investors, banks, and financial institutions to procure capital investment, lines of credit, short and long term borrowing. Prepared and presented due diligence financial documents for merger/acquisition. Responsible for establishing and maintaining internal controls, 401K and stock option plans. Directed legal affairs, contract negotiations and administration. Supervised finance and accounting department in the performance of all accounting functions including accounts receivable, accounts payable, inventory, payroll, cash management, and financial statements. Prepared federal, state, and local tax returns, filings, and reports. Evaluated insurance requirements, including business and workers' compensation. |
| 1987 - 1994 | Creative Computer Applications, Inc., Calabasas, California<br>Creative Computer Applications is a publicly traded provider of hospital information systems and proprietary software used for private and government hospitals.<br>Position: *CFO and Accounting Officer.*<br>Responsibilities: Supervised accounting department in the performance of all accounting functions. Prepared Securities and Exchange Commission reports, including Forms 10-K, 10-Q, 8-K and proxy statements. Directed public and shareholder relations. |
| 1984 - 1987 | **Weil and Company, Certified Public Accountants**, Santa Monica, California<br>Position: *Staff Accountant.*<br>Responsibilities: Provided accounting and financial services to a variety of clients. Services included certified audits, reviews and compilations, projections, consulting, and management advisory services. |

| | |
|---|---|
| <u>Local Government</u> | Past appointee to the **Ventura County Overall Economic Planning and Development Committee**. The committee which is composed of business leaders and city council members from various cities in Ventura County and was tasked with the development and evaluation of county projects to enhance the local economy. |
| <u>Other</u> | California CPA certification. Member American Institute of Certified Public Accountants and California Society of Certified Public Accountants. |
| <u>Education</u> | California State University, Northridge, graduated 1984<br>Northridge, CA<br>Bachelor of Science, Business Administration, Accounting option |